PLANET LINE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 47487, 55185. Promulgated April 27, 1933.

*E. E. Baldwin, Esq.,* and *Frank V. Barns, Esq.,* for the petitioner.
*William E. Davis, Esq.,* and *Paul E. Waring, Esq.,* for the respondent.

OPINION.

MARQUETTE: The question presented is whether the petitioner is taxable upon all the profits derived from the joint operating account provided for in the agreement of March 23, 1923, or whether it is taxable on only one-half of said profits. The determination of this question rests primarily upon the construction and interpretation of the contract of March 23, 1923.

The respondent contends that this contract was one for the purchase of stock in the Planet Steamship Corporation by the petitioner, as well as a contract chartering vessels, and upon this theory he has held that the $270,000 of profits received by the owner out of the joint operating account was income to the petitioner in the first instance and was thereafter paid over to the owner in purchase of stock. The petitioner contends that the contract, when read and considered as a whole, is essentially and primarily concerned with the operation of certain cargo vessels, but provides for an even division of any profits that might accrue. Petitioner urges that the stock-purchase provisions merely gave an option which might provide an added stimulus for successful operation of the vessels, and that the $270,000 paid over to the owner was never income of the petitioner under the terms of the agreement.

Before turning to the specific terms of the contract of March 23, 1923, we think it advisable to consider the facts that motivated the parties entering into this contract. The bondholders of the Green Star Steamship Corporation were faced with the loss of a large sum of money, in the aggregate, unless some plan could be devised

whereby their interests would be protected and their losses minimized. The Planet Steamship Corporation and the petitioner were creatures of the plan devised by the bondholders and Arthur R. Lewis, whereby these mortgaged vessels could be released from claims and libels outstanding against them and put back into operation. The bondholders organized the lessor corporation to acquire the cargo vessels, and Lewis organized the petitioner to lease the vessels from the bondholders' corporation.

The resulting agreement of March 23, 1923, is a tripartite agreement designed to put the above plan into effect, but the obligations imposed by its terms rest primarily upon the owner and the petitioner. It is these obligations with which we are principally concerned in construing this agreement.

It is a cardinal rule of construction that a written instrument must be considered as a whole and the intention of the parties must be collected from the entire writing, not from detached portions thereof. Individual clauses and particular words must be considered in connection with the rest of the agreement, and effect must be given to all parts of the instrument if possible. 13 Corpus Juris, sec. 486. Following that rule, we cannot here consider only the contract provisions relating to possible acquisition of stock by the petitioner, and ignore the other provisions of the agreement.

Considering the contract as a whole, together with the facts as they existed at the time the contract was entered into, it is our opinion that the construction adopted by the respondent is unjustified, because, fundamentally, the contract is a ship-operating agreement and not a contract to purchase capital stock. It is true that petitioner first received the income resulting from the operation of the vessels, but it was obligated under the terms of the agreement to deposit these receipts in a special account, to cover from these deposits so made the expenses of operation, and at the end of every six-month period to account to the owner for all ship voyages made and pay over to the owner its one-half of the profits remaining in the joint operating account. These things were done and constituted the essence of the agreement.

But the agreement further provided, and it is these provisions that are the basis for the respondent's contention, that when the owner's share of profits paid over out of the joint operating account should total the agreed valuation of the seven cargo vessels, viz., $1,880,700, 51 per cent of the owner's capital stock should be transferred to the petitioner. It further provided that the petitioner could pay all or any part of the purchase price with its own funds, but since no such payments were made, this provision need not be further considered.

Do these stock-purchase provisions change the evident intent and purpose of the parties from an operating agreement for mutual benefits to an agreement for the purchase of 51 per cent of the owner's capital stock? We think not. The provisions merely give the petitioner the right to acquire, or an option to acquire, that amount of stock, and specify what funds shall be used in computing the total sum to be paid, that is, the agreed valuation of the cargo vessels. The evidence is undisputed that the only funds received by the owner that could be used in the purchase of the capital stock under the above provisions, were the owner's one-half of the profits in the joint operating account, which totaled approximately $270,000. But under the provisions of paragraph twenty-one, one-half of the profits belonged to the owner in any event, and this is true, regardless of whether these payments were applied against the total payments that were due and payable before petitioner could acquire the stock.

Respondent's contention is further refuted by the guaranty agreement that was entered into at or about the time of the operating agreement. In the guaranty agreement, given by the Seas Shipping Company, Inc., to the owner, it was specifically stated that one of the considerations for leasing the seven cargo vessels to the petitioner was to furnish the latter with a fleet of steamships for operation, but no mention is made therein that said Seas Shipping Company, Inc., would guarantee the payment of the purchase price of the stock. Furthermore, there is no showing made in the record that upon termination of the operating agreement the owner insisted upon the guarantor making good for the unpaid balance of the purchase price. It is almost inconceivable that the owner would fail to exercise its rights under the guaranty agreement if the contract of March 23, 1923, were a contract obligating the petitioner to purchase the stock in question. We think the respondent erred in including the entire profit in petitioner's income.

*Decision will be entered under Rule 50.*